## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN DASSA,  on behalf of himself and a class of all others similarly situated,<br><br><div align="right">Plaintiff,</div><br><div align="center">-against-</div><br>NATIONAL FOOTBALL LEAGUE, INC.; NFL ENTERPRISES LLC; ARIZONA CARDINALS HOLDINGS, INC.; ATLANTA FALCONS FOOTBALL CLUB LLC; BALTIMORE RAVENS LIMITED PARTNERSHIP; BUFFALO BILLS, LLC; PANTHERS FOOTBALL LLC; CHICAGO BEARS FOOTBALL CLUB, INC.; CLEVELAND BROWNS FOOTBALL COMPANY, LLC; DALLAS COWBOYS FOOTBALL CLUB, LTD.; PDB SPORTS, LTD. D/B/A DENVER BRONCOS FOOTBALL CLUB; DETROIT LIONS, INC.; GREEN BAY PACKERS, INC.; HOUSTON NFL HOLDINGS LP; INDIANAPOLIS COLTS, INC.; JACKSONVILLE JAGUARS LLC; KANSAS CITY CHIEFS FOOTBALL CLUB, INC.; MIAMI DOLPHINS, LTD.; MINNESOTA VIKINGS FOOTBALL CLUB LLC; NEW ENGLAND PATRIOTS, LP; NEW ORLEANS LOUISIANA SAINTS LLC; NEW YORK FOOTBALL GIANTS, INC.; NEW YORK JETS LLC; OAKLAND RAIDERS LP; PHILADELPHIA EAGLES FOOTBALL CLUB, INC.; PITTSBURGH STEELERS SPORTS, INC.; CHARGERS FOOTBALL CO., LLC; SAN FRANCISCO FORTY NINERS II, LLC; FOOTBALL NORTHWEST LLC; THE RAMS FOOTBALL COMPANY LLC; BUCCANEERS LIMITED PARTNERSHIP; TENNESSEE FOOTBALL, INC.; WASHINGTON FOOTBALL, INC.; CBS CORPORATION; FOX BROADCASTING COMPANY; NBCUNIVERSAL MEDIA, LLC; ESPN INC.; DIRECTV HOLDINGS, LLC; AND DIRECTV, LLC.,<br><br><div align="right">Defendants.</div> | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

1.      The 32 professional football teams that compete in the National Football League ("NFL") have agreed among themselves to eliminate all competition in the broadcasting and sale of live video presentations of professional football games. As the Supreme Court has observed, each team "is a substantial, independently owned, and independently managed business," competing with its rivals "not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel," as well as "in the market for intellectual property." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 196-97 (2009). Yet rather than compete in the multibillion-dollar football broadcasting market, they have joined forces to restrict supply and raise prices.

2.      It has been clear for more than half a century that such agreements unreasonably restrain trade. In 1953, the Department of Justice sued the NFL and its teams, alleging among other things that a far more limited agreement—an agreement merely prohibiting teams from broadcasting within 75 miles of another team's city when that team was playing a televised game away from home—was illegal under the Sherman Act. *See United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953) ("*NFL I*"). The United States District Court for the Eastern District of Pennsylvania readily agreed that that agreement was an unjustified attempt to "enable the clubs . . . to sell monopoly rights" and "an unreasonable and illegal restraint of trade." *Id.* at 326-27.

3.      In 1961, the court applied this ruling to prevent the joint selling of broadcast rights. *United States v. NFL*, 196 F. Supp. 445 (E.D. Pa. 1961) ("*NFL II*"). In response to this ruling, the NFL lobbied for and obtained a carefully limited antitrust exemption that allows a league of professional football clubs to jointly sell or transfer sponsored telecasting rights. This bill, the Sports Broadcasting Act of 1961 ("SBA"), 15 U.S.C. § 1291, exempted only "the free telecasting of professional sports contests," as former NFL Commissioner Pete Rozelle "[a]bsolutely"

recognized. Congress expressly left the holdings of *NFL I* in place, 15 U.S.C. § 1292, and provided no exemption for pay television distribution.

4.      For some time after the SBA's passage, the NFL and its Teams were content to abide by its limits and jointly produce only free sponsored telecasts, available to anyone with a television and a set of rabbit ears (or the modern equivalent, a digital antenna). As cable and satellite television began to present lucrative opportunities, however, the Teams chose not to compete in this new sphere. Instead, they agreed to forgo all competition and sell their valuable products only jointly, throttling the supply of professional football telecasts in violation of the holdings of *NFL I* and *II*, and outside the carefully limited exemption of the SBA.

5.      No other major sports league in America has such a drastic, total elimination of competition in the broadcasting market. While Major League Baseball ("MLB"), the National Hockey League ("NHL"), and the National Basketball Association ("NBA") have each allocated markets geographically and pooled so-called "out-of-market" rights, none has agreed to centralize control and sale of *all* broadcast rights.[1]

6.      The anticompetitive effects of this agreement are clear and significant. The agreement has restricted the availability of live video presentations of regular season NFL games. The Teams have agreed not to avail themselves of cable, satellite, or Internet distribution channels individually. In the absence of an agreement, each team would have an incentive to distribute its games nationally in these channels. Given the relatively low cost of Internet streaming and satellite and cable television carriage, each team acting independently would offer their games at a competitive price to anybody in the country who wanted to watch that particular team.

---

[1] Although not at issue here, these agreements are themselves anticompetitive and illegal under the antitrust laws. *See generally Laumann v. NHL*, 56 F. Supp. 3d 280, 297-302 (S.D.N.Y. 2014).

7.     Instead, however, the Teams have all forgone this option in favor of creating a more lucrative monopoly. The Teams have agreed to make an offering called "NFL Sunday Ticket" ("Sunday Ticket") the *only* way to view games other than the limited selection of games broadcast through sponsored telecasts (or, as discussed below, the cable channels ESPN and NFL Network) in any given area. Sunday Ticket bundles all other games into one package, sold jointly by the NFL to DirecTV and then to consumers.

8.     This scheme thus doubly overcharges Sunday Ticket purchasers. First, the total elimination of competition allows the NFL, its Teams, and DirecTV to charge supracompetitive monopoly prices, rather than the prices that would exist if the 32 teams were competing for interest and distribution in a free market. Second, Class members must pay for access to all 32 teams' games, even if they are only interested in viewing one or two teams' games.

9.     In addition to allowing Defendants to charge supracompetitive prices for Sunday Ticket, this scheme protects the five networks that currently contract with the NFL to broadcast regular season NFL games: the cable channels ESPN and NFL Network, and the terrestrial networks CBS, NBC, and Fox (collectively, the "Network Defendants"). By limiting the availability of competing products, the agreements drive up the market share and value of the Network Defendants' broadcasts. This allows the Network Defendants to increase advertising revenue and demand higher affiliation or retransmission consent fees from multichannel video programming distributors ("MVPDs"; i.e., cable and satellite providers), which in turn are passed on to Plaintiff, Class members, and others who purchase MVPD packages.

10.     To obtain the benefits of this protection from competition, the Network Defendants have insisted upon and knowingly abetted the Teams' anticompetitive horizontal agreement. Each has agreed to provide its broadcasts to Sunday Ticket, ensuring that individual teams will not need

to create their own broadcasts competitive with the Network Defendants' broadcasts. Their contracts guarantee the continuation of the horizontal scheme, and they have insisted that the NFL restrict the distribution of competing games.

11.     DirecTV has also willfully joined, encouraged, and entrenched the teams' conspiracy. It contracted with the NFL to make Sunday Ticket exclusive to DirecTV, so that no other cable or satellite distributor could sell it. In doing so, it required that the NFL and its Teams preserve their anticompetitive agreement not to compete with one another. DirecTV's agreement to carry Sunday Ticket and not to deal individually with NFL teams is premised upon the continued existence of the anticompetitive agreement not to create and distribute individual team telecasts. On information and belief, DirecTV's contracts with the NFL include clauses mandating that the NFL and its Teams retain that anticompetitive scheme.

12.     This exclusive distribution arrangement is unique among American sports. The comparable bundles of MLB, NHL, and NBA games are each available from numerous distributors, not only DirecTV but many cable companies and competing satellite providers. Not coincidentally, they are all sold at significantly lower prices, despite being subject to anticompetitive restraints of their own. Similarly, outside the United States, the NFL distributes Sunday Ticket through numerous distributors, or even offers the games online without tying them to an MVPD subscription.

13.     Given these three sources of supracompetitive pricing and unlawfully protected market power—the agreement not to compete; the agreement to allow only purchases of a bundle of all 32 teams; and the agreement to sell exclusively through DirecTV—it is no surprise that Defendants are able to charge exorbitant prices to Plaintiff and other class members. Individuals currently pay as much as $359 per season, roughly twice as much as the cost of any other major

league sports package. Bars, restaurants, hotels, and other commercial establishments have it even worse. Limited to only one source for the football programming that many of their customers demand, commercial establishments pay anywhere from $1,458 a year to more than $120,000 a year—as much as ten times more than they pay for other sports packages.

14.     Several examples from other sports leagues confirm the harm such agreements wreak on competition. After the Supreme Court condemned the NCAA's broadcast restraints, output exploded, such that dozens of NCAA football games are now televised every week in every location in the United States. At least three professional sports teams have sued their leagues alleging that their comparable restraints were anticompetitive. And courts have held multiple trials to determine the competitive effects of similar agreements, always concluding that they unreasonably restrained trade.

15.     The agreements challenged in this complaint drastically curb output, reduce choice, and increase price. They unreasonably restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and allow the NFL to unlawfully monopolize the market for live video presentation of professional football games in violation of Section Two of the Sherman Act, 15 U.S.C. § 2. Accordingly, Plaintiff, on behalf of himself and a Class of others similarly situated, seeks injunctive relief putting an end to this anticompetitive scheme and damages to compensate the Class for the supracompetitive overcharges he has paid.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. Defendants transact business in this District and are subject to personal jurisdiction here. Several

Defendants, including National Football League, Inc., NFL Enterprises LLC, CBS Corporation, Fox Broadcasting Company, and NBCUniversal, Inc. are headquartered in this District.

18.     Tens of thousands if not hundreds of thousands of Class members were injured in this District.

## PARTIES

### A.     Plaintiff

19.     Plaintiff Steven Dassa is an individual residing in Wellington, Florida. Mr. Dassa purchased Sunday Ticket from DirecTV for the 2015 season and previous seasons.

### B.     The NFL Defendants

20.     Defendant National Football League, Inc. is an incorporated association of the 32 football teams in the National Football League (the "Teams") with its principal place of business in New York, New York.

21.     NFL Enterprises LLC is a limited liability company with its principal place of business in New York, New York. On information and belief, the Teams have licensed all television broadcasting rights to NFL Enterprises LLC, which negotiates with broadcasters to distribute all live video presentations of NFL games and owns and operates NFL Network.

22.     The 32 Teams are owned and operated by the following entities, each of which is a defendant in this action:

> a.     Arizona Cardinals Holdings, Inc., an Arizona corporation with its principal place of business in Arizona;
>
> b.     Atlanta Falcons Football Club LLC, a Georgia limited liability company with its principal place of business in Georgia;
>
> c.     Baltimore Ravens Limited Partnership, a Maryland limited partnership with its principal place of business in Maryland;

7

d.      Buffalo Bills, LLC, a New York limited liability company with its principal place of business in New York;

e.      Panthers Football LLC, a North Carolina limited liability company with its principal place of business in North Carolina;

f.      Chicago Bears Football Club, Inc., a Delaware corporation with its principal place of business in Illinois;

g.      Cincinnati Bengals, Inc., an Ohio corporation with its principal place of business in Ohio;

h.      Cleveland Browns Football Company, LLC, a Delaware limited liability company with its principal place of business in Cleveland;

i.      Dallas Cowboys Football Club, Ltd., a Texas limited partnership with its principal place of business in Texas;

j.      PDB Sports, Ltd. d/b/a Denver Broncos Football Club, a Colorado corporation with its principal place of business in Colorado;

k.      Detroit Lions, Inc., a Michigan corporation with its principal place of business in Michigan;

l.      Green Bay Packers, Inc., a Wisconsin corporation with its principal place of business in Wisconsin;

m.      Houston NFL Holdings LP, a Delaware limited partnership with its principal place of business in Texas;

n.      Indianapolis Colts, Inc., a Delaware corporation with its principal place of business in Indiana;

o.      Jacksonville Jaguars LLC, a Florida limited liability company with its principal place of business in Florida;

p.      Kansas City Chiefs Football Club, Inc., a Texas corporation with its principal place of business in Missouri;

q.      Miami Dolphins, Ltd., a Florida limited partnership with its principal place of business in Florida;

r.      Minnesota Vikings Football Club LLC, a Minnesota limited liability company with its principal place of business in Minnesota;

s.      New England Patriots, LP, a Delaware limited partnership with its principal place of business in Massachusetts;

t.      New Orleans Louisiana Saints LLC, a Texas limited liability company with its principal place of business in Louisiana;

u.      New York Football Giants, Inc., a New York corporation with its principal place of business in New Jersey;

v.      New York Jets LLC, a Delaware limited liability company with its principal place of business in New Jersey;

w.      Oakland Raiders LP, a California limited partnership with its principal place of business in California;

x.      Philadelphia Eagles Football Club, Inc., a Delaware corporation with its principal place of business in Philadelphia;

y.      Pittsburgh Steelers Sports, Inc., a Pennsylvania corporation with its principal place of business in Pennsylvania;

z.    Chargers Football Company, LLC, a California limited liability company with its principal place of business in California;

aa.   San Francisco Forty Niners II, LLC, a California limited liability company with its principal place of business in California;

bb.   Football Northwest LLC, a Washington limited liability company with its principal place of business in Washington;

cc.   The Rams Football Company LLC, a Delaware limited liability company with its principal place of business in Missouri;

dd.   Buccaneers Limited Partnership, a Delaware limited partnership with its principal place of business in Florida;

ee.   Tennessee Football, Inc., a Delaware corporation with its principal place of business in Tennessee; and

ff.   Washington Football, Inc., a Maryland corporation with its principal place of business in Washington, D.C.

23.    This complaint uses "NFL" to refer collectively to the 32 Teams, National Football League, Inc., and NFL Enterprises, LLC.

**C.    The Network Defendants**

24.    Defendant CBS Corporation ("CBS") is a Delaware corporation with its principal place of business in New York, New York. On information and belief, CBS contracts with NFL to produce and broadcast live video presentations of regular season NFL games.

25.    Defendant Fox Broadcasting Company ("Fox") is a Delaware corporation with its principal place of business in New York, New York. On information and belief, Fox contracts with NFL to produce and broadcast live video presentations of regular season NFL games.

26.      NBCUniversal Media, LLC ("NBC") is a Delaware limited liability company with its principal place of business in New York, New York. On information and belief, NBC contracts with NFL to produce and broadcast live video presentations of regular season NFL games.

27.      ESPN Inc. ("ESPN") is a Delaware corporation with its principal place of business in Bristol, Connecticut. On information and belief, ESPN contracts with NFL to produce and broadcast live video presentations of regular season NFL games.

28.      This Complaint uses "Network Defendants" to refer collectively to CBS, Fox, NBC, and ESPN.

**D.      DirecTV**

29.      Defendant DirecTV Holdings, LLC is a Delaware limited liability company with its principal place of business in El Segundo, California. DirecTV Holdings LLC is the principal United States operating arm of DirecTV, Inc.

30.      Defendant DirecTV, LLC is a California limited liability company with its principal place of business in El Segundo, California. DirecTV, LLC issues bills to commercial subscribers to its satellite television packages, including Sunday Ticket.

31.      This Complaint uses "DirecTV" to refer collectively to these two entities.

**FACTUAL ALLEGATIONS**

**A.      The NFL and Its Teams' Monopoly Control of the Relevant Market**

32.      The NFL is the largest and most popular sports league in America, and the only professional football league of any significance in the country.

33.      The NFL currently comprises 32 Teams. Each of those Teams is an independently owned and operated business. While the Teams must collaborate on certain sport-related topics, such as roster size and game rules, they are otherwise horizontal competitors vying for revenue, fans, personnel, and other economic goods.

34.     The NFL itself is a trade association of the 32 Teams. Until 2015, it was organized as a nonprofit, albeit one whose principal executive officer, Commissioner Roger Goodell, earned roughly $30 million per year.

35.     As that salary illustrates, professional American football is big business. The NFL and its clubs take in an estimated $7.3 billion in annual revenue. While much of that revenue is earned from the Teams' independent competitive activity—gate receipts, concessions, merchandising, and the like—the largest share comes from broadcast revenue. The Teams have pooled their broadcast rights, agreeing that none shall individually license the rights to broadcast their games or otherwise individually offer them in the market. The NFL licenses these pooled rights for an estimated $6 billion annually.

36.     One reason the NFL can command such high rights fees is its monopoly power in the relevant market. The live video presentation of regular season NFL games is a cognizable product market. NFL broadcasts have unique attributes that set them apart from other sports or leisure activities. No other professional major league sport combines the ritual of once-a-week games, the rhythm and explosive energy of football, the intricate strategy of NFL playcalling, and countless other intangible attributes that have made football uniquely appealing to American sports fans.

37.     Similarly, no other entity competes to any significant degree with the NFL in offering professional football games in the United States or broadcasting those games to fans. Since the NFL was created in 1920, no new entrant has had any durable success in entering the market without being co-opted by the NFL. Every attempt at introducing a new league in the United States has folded within a few years, save for the American Football League in 1960, which merged with the NFL once it showed competitive promise.

38. The two other professional football leagues currently operating in America illustrate the NFL's dominance. The Arena Football League, an indoor league with substantially different rules, plays in spring and summer to avoid overlapping with the NFL's schedule and broadcasts many of its games online for free, for lack of any substantial market success. The Fall Experimental Football League, founded in 2014, is not intended as a competitor to the NFL but a "feeder" league to train prospective NFL officials and develop players not currently on NFL teams. It gives away its broadcasts for free and has stated that it does not expect to be profitable without official NFL support.

39. Geographically, the market is contiguous with the United States. The NFL and its broadcast partners have limited their contracts to the United States, recognizing the geographic extent of the market. Moreover, consumers interested in watching regular season NFL games consider games from all over the country, basing viewing decisions on the availability and particular appeal of individual games due to factors such as team loyalty, the quality of players, and the importance to playoff races.

40. In the absence of the horizontal agreement to restrain output in this market, the 32 Teams would compete with one another for viewership, advertising revenues, and rights fees. But the horizontal agreement to eliminate all such competition makes the NFL the only competitor of any significance, giving it monopoly power within the relevant market.

**B.      Relevant History of NFL Broadcasting Agreements**

41. Television coverage of NFL games began in 1939, with regular broadcasting beginning after World War II. By 1950, teams in Los Angeles and Washington, D.C. had negotiated contracts for all of their games to be televised, with many other teams following suit over the course of the 1950s.

42.     As these early clubs worked to get their nascent broadcasting contracts in place, they jointly agreed to restrict broadcasting competition. As of 1953, Article X of the NFL's by-laws prohibited any team from broadcasting its games within 75 miles of another team's home city if that second team was either playing a game at home or playing a game on the road and broadcasting it back home. These restrictions "effectively prevent[ed] 'live' broadcasts or telecasts of practically all outside games in all the home territories." *NFL I*, 116 F. Supp. at 321.[2]

43.     The Department of Justice sued to enjoin enforcement of Article X, contending that it was illegal under Section One of the Sherman Act.

44.     The United States District Court for the Eastern District of Pennsylvania (writing before the Supreme Court had explained that market allocation was per se illegal) considered the competitive effects of the restriction. After noting that, at that time, "less than half the clubs over a period of years are likely to be financially successful" and some teams were "close to financial failure," it found that "[r]easonable protection of home game attendance [was] essential to the very existence of the individual clubs" and that prohibiting broadcasting of outside games while a team was playing a home game was reasonable. *Id.* at 323-25.

45.     At the same time, the *NFL I* court rejected the argument that teams could legally agree not to broadcast in each other's territories when the local team was *not* playing a home game, which "obvious[ly] . . . cannot serve to protect game attendance." *Id.* at 326. Rather, it found, "the testimony of defendants' witnesses consistently indicates that the primary reason for the restrictions in this situation actually is to enable the clubs in the home territories to sell monopoly rights to purchasers of television rights to [their] away games." *Id.* (footnote omitted). It therefore

---

[2] "Outside games" were defined as games "played outside the home territory of a particular home club and in which that home club [was] not a participant." *Id.*

held this restriction to be illegal. *Id.* at 327. It similarly condemned a provision prohibiting radio broadcasts of outside games, finding that even when teams were playing at home there was no evidence of "any significant adverse effect on gate attendance" but only an enhancement of "the value of such rights to purchasers." *Id.*

46.    In the years following this ruling, NFL teams expanded their broadcasting output. By 1960—just a decade after the first clubs obtained distribution for all of their games—most NFL teams were broadcasting their entire seasons, and Sunday games were available on every national network.

47.    Despite this growing success, the NFL and the Teams were not satisfied with competitive results. Instead, they determined that they could make significantly more money by pooling and thus monopolizing their rights, allowing them both to demand higher rights fees from networks and offer networks the ability to be the sole source of NFL games. The Teams therefore transferred their rights to the NFL, which then sold to CBS "the sole and exclusive right to televise all League games." *NFL II*, 196 F. Supp. at 446.

48.    The United States District Court for the Eastern District of Pennsylvania again had no trouble finding that "the member clubs of the League have eliminated competition among themselves in the sale of television rights to their games." *Id.* at 447. It therefore found the CBS contract to violate its judgment in *NFL I* and prohibited the enforcement of the contract. *Id.*

49.    The NFL next turned to Congress, lobbying for an antitrust exemption that would overturn *NFL II* and allow them to pool their rights for the purpose of selling games to over-the-air networks that were available to all viewers for free. This lobbying resulted in the passage of the SBA, which exempted from the Sherman Act

> any agreement by or among persons engaging in or conducting the organized
> professional team sport[] of football . . . , by which any league of clubs

participating in professional football . . . contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the game[] of football . . . engaged in or conducted by such clubs.

15 U.S.C. § 1291.

50.      "[S]ponsored telecasting" as used in the SBA includes "only the free telecasting of professional sports contests, and does not cover pay T.V." *Shaw v. Dallas Cowboys Football Club, Ltd.*, No. 97-cv-5184, 1998 WL 419765, at *4 (E.D. Pa. June 23, 1998), *aff'd*, 172 F.3d 299 (3d Cir. 1999) (quoting Telecasting of Professional Sports Contests: Hearing before the Antitrust Committee of the House Committee on the Judiciary on H.R. 8757, 87th Cong. 1st Sess. at 36 (Sept. 13, 1961). Even then-Commissioner Rozelle acknowledged that this was "[a]bsolutely" correct. *Id.* "Subscription television," such as cable and satellite television, was excluded from the exemption. *See, e.g.*, *Shaw*, 172 F.3d at 301-03; *Laumann v. NHL*, 907 F. Supp. 2d 465, 489 n.141 (S.D.N.Y. 2012).

51.      The NFL and its Teams were content to abide by this limitation for some 25 years, broadcasting on as many as three free, over-the-air networks simultaneously. Once again, however, the lure of increased revenues proved irresistible. With the growth of cable television—which, unlike the sponsored telecasts envisioned by the SBA, are available only to paying subscribers— and its lucrative subscriber base, the NFL and its Teams chose to ignore the limitations on the exemption they had received in the SBA and instead to sell their horizontally pooled rights to cable networks.

52.      In 1987, ESPN became the first cable broadcaster of NFL games—games that were subject to the same restrictive horizontal agreement that had previously been used only to arrange the publicly available sponsored telecasts.

53.      As a result of the NFL and its Teams' output restrictions, consumers in any given area had no authorized means of watching most regular season NFL games, despite the increasing

capacity to distribute the games and the decreasing cost of doing so. Instead, they were artificially limited to those few games, usually no more than four or five per week (and no more than two at any given time), that the Network Defendants and the NFL chose to broadcast in their area. This artificially constrained output created a large, unserved demand for the inaccessible games, leading to a surge in piracy of distant feeds in the 1980s.

54.     The NFL wanted to cut down on this piracy (which, though it fueled interest in football, did not directly profit the NFL or its Teams) and capitalize on the pent-up demand created by the horizontal supply restriction, but without forgoing its monopoly control of all broadcast rights. In 1987, it developed a plan that prefigured the modern Sunday Ticket package: market an encrypted package of all games that could be viewed by consumers who purchased a decoder.

55.     According to sports journalist Gregg Easterbrook, CBS opposed the idea, fearing that the dilution of their ratings would decrease their advertising revenue, and this plan was not implemented as originally conceived.

56.     In December 1993, however, Fox outbid CBS for broadcast rights, removing an important obstacle to the planned package. At the same time, the advent of direct-broadcast satellite television service ("DBS") made distribution of all games easy and inexpensive. Those early DBS providers could carry a larger number of channels than contemporaneous cable providers without running into capacity constraints. (Capacity constraints are no longer a significant factor for either DBS or cable providers.)

57.     For the 1994 season, the NFL bundled together a package of games that could be sold nationwide, allowing the NFL and its Teams to offer a single, monopolized product containing the various products they would otherwise sell individually. This package would become the product known today as Sunday Ticket.

58.     DirecTV, the second commercial DBS provider in America, also launched in 1994, just a few months before the NFL season began. It contracted with the NFL to license Sunday Ticket exclusively, making it the only source for the vast majority of regular season NFL games in any part of the country. Since then, DirecTV has successfully convinced the NFL to continue licensing Sunday Ticket exclusively, even though the technological impediments to carriage by cable providers or on the Internet have long since faded away.

59.     Even with CBS temporarily out of the picture,[3] the NFL still encountered resistance from its other broadcast networks. Moreover, it could not create Sunday Ticket without the networks' agreement to provide their feeds of games to DirecTV. The networks demanded concessions and limitations on Sunday Ticket in exchange. For example, Fox insisted on and received a commitment that Sunday Ticket be capped at one million subscribers annually. This cap has slightly increased over the years but, on information and belief, remains a contractual obligation.

**C.     Current Broadcasting Agreements**

60.     Today, the NFL and its 32 Teams maintain the horizontal agreements that prevent any Team from selling its games individually, restricting supply and immunizing the Teams from the effects of horizontal competition.

61.     Regular season NFL games are currently broadcast in two principal ways.

**1.     Over-the-Air and Cable Broadcasts**

62.     First, as they have done since 1987, the NFL and its Teams sell their pooled rights to over-the-air and cable networks. Currently, they contract with five networks: the over-the-air networks NBC, Fox, and CBS; the subscription network ESPN; and the NFL's own subscription

---

[3] CBS resumed broadcasting NFL games in 1998.

network, NFL Network. When the NFL most recently negotiated these contracts, in 2011, it was reported that the deals lasted at least 8 years and until 2022 in some cases, and totaled some $27 billion in licensing fees.

63.    The Network Defendants produce broadcasts of each game to which they hold the rights, such that one television broadcast is created for each regular-season or playoff game.

64.    During the regular season, most games take place on Sunday afternoons at approximately 1 p.m. or 4:25 p.m. Eastern time. These games are split between CBS and Fox, with CBS holding the exclusive rights to broadcast American Football Conference ("AFC") games and Fox the exclusive rights to broadcast National Football Conference ("NFC") games. In most weeks, there are between eleven and thirteen Sunday afternoon games. In addition, the NFL typically schedules one game on Sunday, Monday, and Thursday nights. These night games are licensed exclusively to NBC, ESPN, and NFL Network, respectively, for national distribution.

65.    For the Sunday afternoon games, CBS and Fox, in consultation with the NFL, determine which games will be broadcast in which locations. Typically, each network makes only one game available in any given location at a time. Each week, one network has the rights to air one game in each timeslot, while the other network may air a game only in one timeslot. For example, in a given week, CBS would choose one AFC game to make available in a given location at 1 p.m. and one to make available at 4:25 p.m. Fox would have the right to air NFC games in only one timeslot in a week that CBS was permitted to show two games. On another week, CBS's and Fox's roles would be reversed, with Fox broadcasting two games and CBS broadcasting one. League rules further limit the games available in a market in which a team is playing a Sunday afternoon game, such that under certain circumstances only one other game will be available.

66.     Thus, in any location in America, there are no more than two regular-season games available on television at any given time—even though there may be as many as seven games being played simultaneously, by fourteen teams. In total, no more than three Sunday afternoon games are typically shown in a given location, despite as many as thirteen games being played on Sunday afternoon.

2.     **NFL Sunday Ticket**

67.     Second, the NFL licenses Sunday Ticket exclusively to DirecTV for United States distribution, as it has done at all times since the 1994 season. Although the Sunday Ticket licensing contract has repeatedly been up for renegotiation, DirecTV has consistently offered a premium to ensure that it remains exclusive to DirecTV. Simultaneously, the NFL has sought to restrict Sunday Ticket to DirecTV, rather than make it more broadly available—i.e., at a cheaper price or to more consumers—to satisfy the Network Defendants' concerns and ensure that each participant in the scheme retains monopoly profits to the greatest extent possible.

68.     The NFL and DirecTV signed their most recent Sunday Ticket contract in 2014, reportedly guaranteeing DirecTV eight years of exclusivity for $12 billion in licensing fees.

69.     Currently, in any given area, DirecTV makes the Network Defendants' telecasts of most games available nationwide to Sunday Ticket subscribers, but blacks out games that the Network Defendants are broadcasting in each subscriber's location. Those games are available only through the particular Network Defendant's own channel.

70.     Beginning in 2010, DirecTV also made Sunday Ticket available over the Internet to residents of apartment buildings in New York, Philadelphia, or San Francisco who could not install DirecTV satellite dishes. Shortly after DirecTV's merger with AT&T in August 2015, DirecTV slightly expanded this plan, making Sunday Ticket available over the Internet to certain

other consumers who could not install DirecTV. Consumers who do not qualify have no authorized means to view live regular season NFL games on the Internet, and all consumers are required to purchase the package through DirecTV.

### D. The Challenged Agreements Harm Competition

#### 1. The Agreements Restrict Output and Raise Prices

71.     The NFL and its Teams' agreement to pool broadcasts is a classic horizontal supply restriction. Bedrock economic principles teach that a horizontal agreement by 32 market participants not to compete, but rather to sell their products collectively, will reduce output, raise prices, and harm consumers.

72.     This harm is evident in many forms. First, the availability of football broadcasts on standard over-the-air and cable channels is vastly lower than it would otherwise be. NFL football has the highest ratings of all sports programs. Yet only two or three Sunday afternoon games are available to fans. By contrast, NCAA football, whose similar restraints were found to violate the antitrust laws by the Supreme Court, is now available on dozens of different networks on Saturday afternoons, with no limit on the number of games aired at the same time.

73.     Second, the output of NFL broadcasts, considered on a per-game basis, is half the output of the other major American sports leagues.[4] In the NHL, NBA, and MLB, where teams are allowed to negotiate with broadcasters, teams typically produce two broadcasts per game, each with distinct characteristics appealing to different consumers. In the NFL, by contrast, the NFL and the Network Defendants create just one broadcast for each game.

---

[4] On an absolute basis, the disparity is even greater, but this is because the NFL season has roughly 10-20% as many games as the other leagues.

74.     Unsurprisingly, these supply restrictions come with correspondingly astronomic prices, just as antitrust economics predict. Sunday Ticket costs up to ten times as much as the other major sports leagues' comparable packages (and at a minimum, nearly twice as much), despite containing far less content both on an absolute and a per-game basis. For the 2015 season, DirecTV and the NFL charge as much as $359 for a full season of Sunday Ticket to individual subscribers, and anywhere from $1,458 to more than $120,000 for commercial subscribers. Prices increase nearly every year; between the 2014 and 2015 seasons, for example, DirecTV and the NFL increased prices roughly 11.5%.

75.     But for the anticompetitive agreements, each Team would create its own broadcasts and sell those broadcasts in a competitive marketplace. This would naturally force prices down at the same time it increased output. A bundle of games, whether sold as Sunday Ticket or in another form, would continue to be profitable enough that the Teams would have an incentive to continue offering it—but its prices would necessarily decrease in the face of nationwide competition from individual Teams.

76.     The contrast between NFL radio broadcasting and NFL television broadcasting illustrates this harm. NFL Teams negotiate individual radio broadcasting contracts, rather than consolidating all broadcasting in the NFL itself. Each Team produces (or contracts with a third party to produce) its own radio broadcast of its games, so that a fan of each Team in a game can consume a broadcast catering to that fan base. As a result, there are twice as many NFL radio broadcasts as there are television broadcasts. The Team or its radio partner licenses those broadcasts to multiple radio stations—many of which broadcast the game free on the Internet nationwide. Thus, despite there being *less* demand for radio broadcasts, the NFL and its Teams

produce *more* output and make it more broadly available—a disparity that can only be explained by the anticompetitive effect of the horizontal restraint on television broadcasting.

77.     The NFL and its Teams' agreement to sell the bundled games through an exclusive distributor significantly exacerbates the anticompetitive effect of the agreements. By licensing their artificial, highly valuable monopoly to DirecTV exclusively—rather than offering it through multiple distributors as they do outside the United States and as all other sports leagues do—they not only increase prices and restrict availability for Sunday Ticket, but they distort competition among MVPDs and between MVPDs and the Internet. Indeed, in service to this agreement to distribute exclusively, which is unique among major American sports leagues, the NFL does not provide any means of online availability for many consumers, drastically limiting output compared to the other leagues.

### 2.     There Are No Procompetitive Benefits, and Any That Might Exist Could Be Achieved through Less Restrictive Means

78.     These output restrictions have no procompetitive benefits—and even if they did, any such benefits could be achieved through less restrictive means. Even though other major sports leagues engage in anticompetitive horizontal restrictions of their own, none has sought to completely eliminate individual teams' output—and yet none of them have any problems broadcasting all or nearly all of their games. Indeed, as discussed above, the other leagues have *more* per-game output.

79.     Moreover, NFL broadcasting rights—even without the scheme to monopolize and restrict them—are an extraordinarily valuable commodity. The Nielsen Company estimated that the 2014 regular season alone reached 202.3 million unique viewers, representing 80 percent of all

television homes and 68% percent of all potential viewers in the United States.[5] Viewership for

NFL games regularly eclipses that of any other program on television. During the 2014 regular

season, every one of the 20 most-watched programs in America was an NFL game, as were 25 of

the next 30. Indeed, for the past three years, an NFL game was the most-watched program on

television for each week of the NFL season. This trend shows no signs of abating. For example, a

preseason game between the Minnesota Vikings and the Pittsburgh Steelers on August 11, 2015

was the most-watched program in America for the entire week, according to the Nielsen ratings

service—despite being a preseason game, rather than a regular season game, and between two

relatively small-market teams. As Nielsen summarized earlier this year, "NFL fans make every

game a Super Bowl."

80.     Given this tremendous viewership, there can be no serious argument that NFL

Teams would have trouble obtaining distribution without their horizontal restraint. The supply

restriction has the effect and purpose of concentrating viewership in a limited number of

broadcasts, allowing the Network Defendants to charge higher fees for advertising and demand

greater affiliation or broadcast retransmission fees from cable and satellite providers. But even

though revenues—and prices to advertisers and consumers—would be lower without the restraint,

they would still be more than sufficient to incentivize Teams to broadcast their individual games

as broadly as possible, particularly giving the relatively low costs of distribution.

81.     Similarly, restrictions are not necessary to preserve attendance at games, as they

were thought to have been in the 1950s. Industry observers and participants widely believe the

notion that video broadcasts hurt attendance to be antiquated and wrong; rather, the consensus is

---

[5] On information and belief, the statistics in this paragraph do not include viewership
through Sunday Ticket—meaning that even these impressive statistics underestimate the demand
for football broadcasts.

that they are complementary products that increase interest and thus increase attendance, merchandise purchases, and other valuable forms of fan engagement. Indeed, many less popular leagues, such as the Arena Football League, give their broadcasts away for free on the Internet in the hopes of generating interest. The NFL itself has now abandoned all blackouts of non-sold-out local games, having been the last major sports league to limit broadcasts to encourage ticket sales.

82.     Even if the restrictions did protect game attendance, that protection is no longer justified as it may have been in the 1950s. The *NFL I* court relied heavily on its findings that "less than half the clubs over a period of years are likely to be financially successful" and that "the very existence of the individual clubs" required "protection of home game attendance." *NFL I*, 116 F. Supp. at 323, 325.[6] Today, the average NFL Team is worth $2 billion, according to Forbes, with even the least valuable team valued at $1.4 billion. There is no plausible risk that any Teams would be driven out of business if required to license its lucrative broadcast rights individually.

83.     Nor are the restrictions necessary to foster competitive balance. Whatever measures may be acceptable in pursuing the goal of competitive balance, they cannot justify eliminating all broadcasting competition and thereby restricting supply, raising prices and revenues. The NFL and its Teams engage in a variety of other measures to ensure competitive balance, such as salary caps that are exempt from antitrust scrutiny under labor exemptions; there is no need to monopolize the broadcasting market as well. If the NFL and its Teams were simply interested in competitive

---

[6] Even in 1953, this finding was at best debatable. It is true that 48 teams went out of business in the 1920s and early 1930s, including such marginal and short-lived entrants as the Duluth Eskimos and the Toledo Maroons. However, television broadcasting and the NFL's restriction of entry into the league largely put a stop to that competitive challenge. As of 1953, only two teams had gone out of business in the fourteen years since television broadcasting of football began. Despite the NFL's predictions during the *NFL I* trial, no teams have gone out of business since *NFL I* struck down part of the NFL's broadcast restrictions.

balance, they could generate revenues through ordinary competitive means and then engage in some permissible form of revenue sharing, or otherwise participate in less restrictive agreements.

3.   **Examples from Other Leagues Confirm That Comparable Agreements Harm Competition**

84.   Both empirical evidence and the opinions of sports teams themselves confirm that restrictions such as these harm competition—and that eliminating them produces an explosion in output.

85.   The example of Division I college football is an instructive comparison. Before 1984, the NCAA limited the total number of televised intercollegiate football games and the number of games that any one college could televise. It also prohibited colleges from broadcasting through sources other than ABC and CBS.

86.   Two universities sued the NCAA, leading the Supreme Court to find that the NCAA's plan violated Section One of the Sherman Act. After a full trial, the United States District Court for the Western District of Oklahoma found that the NCAA was a "classic cartel" that had "sought and achieved a price for their product which is, in most instances, artificially high." *NCAA v. Bd. of Regents of Okla.*, 468 U.S. 85, 96 (1984) (quoting 546 F. Supp. 1276, 1300-01 (W.D. Okla. 1982)). The district court found the plan to constitute price-fixing, a group boycott, and artificial limit on production. It rejected the NCAA's proffered justifications that competition would adversely affect gate attendance or harm competitive balance.

87.   The United States Court of Appeals for the Tenth Circuit affirmed,[7] as did the Supreme Court. The Supreme Court found the NCAA's plan to be "a horizontal restraint" that both "create[d] a limitation on output" and "constitut[ed] horizontal price fixing." *Id.* at 99-100.

_____

[7] The appellate court did remand to modify the district court's injunctive decree.

This created "a significant potential for anticompetitive effects"—a potential that "ha[d] been realized." *Id.* at 104-05. As the district court had found, "if member institutions were free to sell television rights, many more games would be shown on television"; prices were not only inflated but "unresponsive to viewer demand and unrelated to the prices that would prevail in a competitive market." *Id.* at 105-06. The "anticompetitive consequences of this arrangement," the Supreme Court said, were "apparent." *Id.* at 106. Nor were there "any procompetitive efficiencies which enhanced the competitiveness of college football television rights; to the contrary . . . NCAA football could be marketed just as effectively without the television plan." *Id.* at 114.

88.     After the NCAA's plan was abolished, the Supreme Court's prediction that "many more games would be shown on television" proved true. Today, Division I college football and basketball are among the most heavily televised sports in the country. All four major broadcast networks nationally televise college football games, as do at least three ESPN channels (ESPN, ESPN 2, and ESPNU), Fox Sports 1, CBS Sports Network, and NBC Sports Network. Most regional sports networks ("RSNs") also carry college football, as do three regional Fox College Sports Networks and various NCAA conference-created channels. Similarly, at least 10 networks carry college basketball nationally, along with many RSNs and the Fox College Sports Networks.

89.     This example confirms the obvious: agreements to monopolize and restrict the availability of sports broadcasts raise the prices of those broadcasts and reduce their output, exactly as intended. It strongly suggests that, in the absence of the agreements challenged here, teams would have no difficulty finding national distributors for their currently untelevised games. Indeed, given the far higher popularity of professional football and the far lower number of games, the most likely outcome would be that every team would find a national distributor for every one of its games.

90.     Sports teams themselves have acknowledged these facts, when they have become dissatisfied with the terms under which their league's monopoly rents were shared. In addition to the University of Oklahoma and the University of Georgia, professional hockey and basketball teams have sued their leagues, alleging that their broadcasting restrictions unlawfully restrained trade.

91.     Madison Square Garden Company, ("MSG") the owner of the New York Rangers professional ice hockey club and two RSNs, sued the NHL in 2007, alleging that its television and Internet restrictions—which, as noted above, do not eliminate all club broadcasts as the NFL does—were anticompetitive and unlawful. *See Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.). MSG alleged in its complaint that the NHL's restraints "reduced output, diminished product quality, diminished choice and suppressed price competition," and that "[t]here are no legitimate, procompetitive justifications for these 'exclusive' agreements and other competitive restraints, which have harmed consumers in various ways." After this Court denied the NHL's motion to dismiss, MSG and the NHL settled their lawsuit on a confidential basis, allowing the anticompetitive restraint to stay in place (and, presumably, giving MSG a greater share of the bounty).

92.     Similarly, in a bankruptcy adversary action brought by the Phoenix Coyotes hockey club against the NHL, the Coyotes alleged that "[t]he NHL and its members have conspired to create exclusive television and radio broadcast rights . . . thereby maintaining monopoly power." *Coyotes Hockey LLC v. NHL*, Av. No. 09-494 (Bankr. D. Ariz. June 5, 2009). This claim was similarly resolved without upsetting the anticompetitive scheme, as the NHL obtained ownership of the Coyotes through the bankruptcy.

93.     In basketball, too, at least one team has acknowledged the anticompetitive effect of broadcasting restraints. The Chicago Bulls challenged NBA limitations on distribution on so-called "superstations," reducing the number of games shown nationwide. The Bulls took the NBA to trial twice and proved the restraints' unlawfulness both times.[8] As the United States District Court for the Eastern District of Illinois found, the restraints "reduce availability and competition in the hope of raising the price of the product in the future. Such a restraint is unreasonable and therefore unlawful." *Chicago Prof'l Sports L.P. v. NBA*, 754 F. Supp. 1336, 1364 (E.D. Ill. 1991), *aff'd*, 961 F.2d 667 (7th Cir. 1992).

94.     Thus a natural experiment in college football, the views of multiple sports teams, and the verdicts from multiple bench trials all support the same conclusion: sports leagues that restrict their teams' broadcasting rights unlawfully restrain trade.

### E.      The Network Defendants and DirecTV Have Participated in This Anticompetitive Scheme

95.     Although the principal agreements challenged here are the horizontal agreements among the Teams, those agreements have been facilitated, encouraged, and expanded by the Network Defendants and DirecTV.

96.     The main purpose of the restrictions is to make rights more valuable to broadcasters, thus allowing them to earn more money from the sale of NFL broadcasts. Networks are able to charge more to advertisers and more to MVPDs (in the form of affiliation fees, in the case of ESPN and the NFL Network; in the form of retransmission consent fees, in the case of Fox, CBS, and NBC). They ensure that no more than six games will be broadcast on television in

---

[8] Ultimately the NBA defeated the second suit, but on the basis of a "single entity" defense that the Supreme Court definitively rejected in *American Needle*.

any given week, cutting the competition that each broadcaster would face from fourteen or fifteen games to five.

97.     This effect is particularly pronounced for the Sunday afternoon games broadcast by CBS and Fox. In a competitive market, up to seven games would be broadcast simultaneously (which would still be significantly less than the number of college football games that are typically broadcast at the same time). This would represent a massive increase in consumer choice—but would give CBS and Fox direct competitors that would reduce their ratings and revenue. By keeping those games off regular television and restricting them only to DirecTV subscribers who are willing to pay for the supracompetitively priced bundle, the scheme gives CBS and Fox an artificial duopoly over one of the most valuable commodities in all of television.

98.     The Network Defendants and DirecTV have paid more—and made clear to the NFL that they will pay more—for that exclusivity. On information and belief, each of the Network Defendants and DirecTV has insisted on contractual clauses guaranteeing that the Teams will continue to sell their rights only through the NFL, putting the NFL at risk of facing serious monetary consequences if they should end their scheme.

99.     Similarly, the Network Defendants pressured the NFL not to market Sunday Ticket or to limit its availability. As discussed above, CBS opposed the creation of Sunday Ticket, and Fox demanded limits on the number of subscribers. These subscriber limits effectively required the NFL and the Teams to ensure that Sunday Ticket would have high prices and low availability.

100.    Moreover, the participation of cable networks ESPN and NFL Network exacerbates the anticompetitive harms wrought by the agreements. Because of the scheme to reduce competition, ESPN and NFL Network are able to charge inordinately large subscription fees to MVPDs, which are then passed on to consumers. In part due to the exclusivity it has purchased

from the horizontal cartel, ESPN is the single most expensive cable channel in America. Indeed, according to a 2014 Wall Street Journal analysis, ESPN cost $6.04 a month on average, more than four times as much as the second-most expensive channel, TNT, which cost just $1.48 a month. MVPDs' robust profit margins suggest that much of this exorbitant price is passed on to consumers.

101.    Much like the Network Defendants, DirecTV requires the NFL and its Teams to maintain their anticompetitive agreement, and has paid handsomely to ensure compliance. Indeed, DirecTV has significantly expanded the agreement, preventing online distribution of live games until recent years, and even today limiting online distribution primarily to individuals unable to install DirecTV in their households. Because of DirecTV's participation in the scheme, the United States is one of the only countries in the world where NFL games are not offered online to all consumers. Similarly, the NFL and its teams have licensed Sunday Ticket to more than a dozen satellite and cable providers in Canada, which they would have done in the United States as well but for DirecTV's inducements and demands.

102.    There are no procompetitive benefits to the exclusive distribution arrangement. Exclusive distribution can sometimes promote inter-brand competition, but because the NFL is the only provider of major-league professional football telecasts in the United States, there is no relevant inter-brand competition.

## F.    Plaintiff Has Suffered Antitrust Injury

103.    Plaintiff has been overcharged for live video presentations of regular season NFL games.

104.    As a subscriber to NFL Sunday Ticket, Plaintiff has been charged supracompetitive prices for live video presentations of regular season NFL games because of the horizontal output

restrictions and the participation of the Network Defendants and DirecTV in limiting availability and increasing the price of the Sunday Ticket package.

105.    As a purchaser of MVPD service that includes NFL programming, Plaintiff has been charged supracompetitive prices for live video presentations of regular season NFL games because of the horizontal output restrictions and the participation of the Network Defendants and DirecTV in limiting competition among and availability of such presentations.

106.    Plaintiff has been injured by the unavailability of live video presentations of regular season NFL games over the Internet, which he would consider as competitive substitutes if they were made available by NFL Teams or the NFL. The horizontal output restrictions and the participation of the Network Defendants and DirecTV in limiting competition among and availability of such presentations have prevented such Internet distribution.

107.    Plaintiff has been injured by the Teams' joint refusal to offer the vast majority of live video presentations of regular season NFL games over the Internet, on free over-the-air networks, or as part of any pay television service other than DirecTV.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons in the United States who purchased Sunday Ticket between June 17, 2011 and the present, excluding Defendants and their present and former parents, subsidiaries, affiliates, and co-conspirators, as well as the District Court and any individuals required to be excluded under 28 U.S.C. § 455(b)(4)-(5).[9]

---

[9] Although individuals or businesses who did not purchase Sunday Ticket during the Class Period may also have valid claims, Plaintiff does not seek to represent them in this action.

109.   This class is so numerous and geographically dispersed that joinder of all members is impracticable. According to a 2013 Bloomberg analysis, more than 2 million people subscribed to Sunday Ticket in the United States. The exact number and identity of all Class members can be ascertained through Defendants' records.

110.   There are questions of law and fact common to the Class, including:

a.   Whether the NFL and its Teams engaged in a contract, combination, or conspiracy to reduce output and/or fix, raise, maintain or stabilize prices of live video presentations of regular season NFL games by agreeing that all video presentations would be licensed exclusively by the NFL;

b.   Whether the Network Defendants and DirecTV participated in any such contract, combination, or conspiracy;

c.   The effect of Defendants' agreements on the prices of Sunday Ticket in the United States during the class period;

d.   The effect of Defendants' agreements on the retransmission consent and affiliate fees charged by the Network Defendants to MVPDs;

e.   The effect of Defendants' agreements on the subscription fees charged by MVPDs that carry the Network Defendants;

f.   Whether *per se*, quick look, or rule of reason analysis is appropriate;

g.   Whether, if *per se* analysis is inappropriate, there are any procompetitive benefits to the challenged agreements that could not be achieved by less restrictive means;

h.   whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S. C. § 1;

      i.      Whether the alleged agreements violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

      j.      Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the Plaintiff and the other members of the Class; and

      k.      The appropriate class-wide measure of damages.

111.    Plaintiff purchased Sunday Ticket for the 2015 season and previous seasons. His claims are typical of the claims of other Class members, and he is committed to fairly and adequately protecting the interests of the Class.

112.    Plaintiff's counsel is competent and experienced in the prosecution of antitrust and class action litigation.

113.    Given the high cost of establishing that the Defendants' agreements violated the antitrust laws (including, but not limited to, substantial expert witness costs and attorneys' fees), a class action is the only economically feasible means for any plaintiff to enforce his or her statutory rights.

114.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, potentially establishing incompatible standards of conduct for Defendants.

115.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

116.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which Defendants

should possess purchase records making Class members readily ascertainable. Prosecution as a class action will eliminate the possibility of repetitious litigation that is burdensome on both Defendants and the judicial system. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## CLAIMS FOR RELIEF

### Count One—Violation of Section One of the Sherman Act

117.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

118.    Defendants, by and through their officers, directors, employees, agents, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrain competition in the licensing and distribution of live video presentations of regular season NFL games, with the purpose, intent, and effect of restraining trade and commerce and increasing prices paid by consumers and advertisers to distributors of live video presentations of regular season NFL games.

119.    Defendants' anticompetitive conduct injured class members by decreasing the availability of live video presentations of regular season NFL games, decreasing choice among game broadcasts and among distributors, and increasing the cost of accessing live video presentations, including but not limited to increasing the price charged by DirecTV for Sunday Ticket.

120.    Defendants' anticompetitive conduct harms competition and lacks any procompetitive benefits; if any procompetitive benefits do exist, they can be achieved by less restrictive means and do not outweigh the harm to competition.

### Count Two—Violation of Section Two of the Sherman Act

121.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

122.    All Defendants, by and through their officers, directors, employees, agents, or other representatives, have unlawfully conspired to monopolize the market for live video presentations of regular season NFL games, in violation of 15 U.S.C. § 2.

123.    Specifically, the NFL and its Teams agreed to consolidate all licensing rights for live video presentations of regular season NFL games into a single entity, with the purpose, intent, and effect of monopolizing the market for licensing and increasing prices paid by consumers and advertisers to distributors of live video presentations of regular season NFL games (and thereby increasing prices paid by distributors for the rights to distribute such presentations). These activities have gone beyond those which could be considered "legitimate business activities" and are an abuse of market power. The Network Defendants and DirecTV have conspired to sustain and retrench this monopoly by insisting on its continuation in contracts with the NFL.

124.    Defendants, by and through their officers, directors, employees, agents, or other representatives, have conspired to give DirecTV a monopoly in the distribution of live video presentations of regular season NFL games, making it the only source for the vast majority of NFL games in any given location, including as many as ten (of eleven to thirteen) Sunday afternoon games. This has allowed DirecTV to charge supracompetitive prices and insulated the Network

Defendants from the competition that they would face in the presence of competitive, non-monopolized distribution.

125.    Defendants' anticompetitive conduct injured class members by decreasing the availability of live video presentations of regular season NFL games, decreasing choice among game broadcasts and among distributors, and increasing the cost of accessing live video presentations, including but not limited to increasing the price charged by DirecTV for Sunday Ticket.

## PRAYER FOR RELIEF

126.    WHEREFORE, Plaintiff, on behalf of himself and a class of all others similarly situated, request that the Court enter an order or judgment against Defendants including the following:

a.    Certification of the class described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Appointment of Steven Dassa as Class Representative and his counsel of record as Class Counsel;

c.    Compensatory damages in an amount to be proven at trial and trebled thereafter;

d.    Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.    A permanent injunction prohibiting Defendants from hereafter agreeing to restrain competition in the licensing and broadcasting of live video presentations of regular-season NFL games;

    f.     The costs of bringing this suit, including reasonable attorneys' fees and expenses;

    g.     Service awards to compensate Plaintiff Steven Dassa for his efforts in pursuit of this litigation; and

    h.     All other relief to which Plaintiff Steven Dassa and the Class may be entitled at law or in equity.

## JURY DEMAND

127.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: November 16, 2015

Respectfully submitted,

POMERANTZ LLP

Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Foor
New York, New York 10016
Tel: 212-661-1100
Fax: 212-661-8665
migross@pomlaw.com
jalieberman@pomlaw.con

Jayne A. Goldstein
POMERANTZ LLP
1792 Bell Tower Lane
Suite 203
Weston, FL 33326
Telephone: (561) 270-0795
Facsimile: (954) 315-3455
jagoldstein@pomlaw.com

*Attorneys for Plaintiff and the proposed Class*